The next case for today is 2020-50277, Roque v. Harvel. Mr. Laird, you may proceed. Thank you, Your Honor. May it please the Court, Gray Laird, for the appellate James Harvel. We respectfully submit that the District Court in this case erred in finding that Officer Harvel was entitled to qualified immunity only with regard to the first shot and not the second and third shots fired. We contend that the District Court primarily erred in finding, in relying on the general rule or standard in Tennessee v. Gardner, as well as the Mason v. Lafayette City case, has clearly established law that the Fourth Amendment prohibited Officer Harvel's conduct in the precise situation that he was dealing with on the date of this incident. Those cases are clearly distinguishable from the facts of this case. The Gardner case, by the District Court as well as the plaintiffs here, were dealing with a suspect who there was never any question that he was unarmed. The officer himself testified that as he saw the suspect nearing the fence, he had a clear view of the suspect's face, of his hands, and he believed that the suspect was unarmed the entire time. And that's definitely in contrast with the situation here, where just an instant before Officer Harvel fired the second shot, the District Court found that it was two seconds later. Mr. Roque had directed the gun in the direction of the officers, and that's what caused Officer Harvel to fire the first shot. So that's in complete contrast with the Tennessee v. Gardner case. And as the Court is aware, the Supreme Court has on several occasions stated that courts should not use the general standard for the use of deadly force that the Supreme Court set out in Tennessee v. Gardner as the clearly established law that the officers' conduct violated the Fourth Amendment. The other case that the District Court and the plaintiffs primarily rely on is the Fifth Circuit case, the Mason v. Lafayette case in 2015. And again, that case is also clearly distinguishable from the facts of this case. In this case in Mason, the officer initially fired five shots at the suspect, and the suspect went all the way down to the ground. And the court determined that there was a fact dispute between the officer's testimony that the suspect, while he was down on the ground, attempted to reach for a gun, I believe, around his belt. The suspect's girlfriend, who was right there and was in the room, testified that the only action that the suspect took while he was face down on the ground was to lift his head. She denied that he ever reached for his gun or made any move that would be any type of imminent threat to the officers or anyone else. So in that case, the suspect was clearly incapacitated, face down on the ground, as compared to here. Here we know from the video that after the first shot, Jason Roque was not clearly incapacitated. He certainly wasn't clearly incapacitated from the perspective of Officer Harville and the other officers who were over 60 yards down the street. Isn't there a fact issue on that? Pardon me, Your Honor? Isn't there a fact issue on whether the officers would know that he dropped his gun and also that he's falling over and going away from being able to hurt anybody? Isn't there a fact issue that the district court found on those questions? That's correct, Your Honor. The district court found that those were fact issues, but I would submit that... Well, actually, the Fifth Circuit in the Valderez case that we cited found that whether or not the suspect is actually armed is not material. What's material is whether or not, from the officer's perception, he was posed an imminent threat of harm. And here, the only evidence that shows from the officer's perspective is, of course, Officer Harville's testimony, as well as the other officers. The only other evidence that the plaintiffs and the district court relied on was the video evidence from... There were three separate videos, none of which show or really even close from Officer Harville's perspective. They're much closer than he was. They're from a completely different angle than he was, and it clearly does not represent what he would have seen from his perspective. So, from his perspective, you have an incident which happens in a matter of seconds, just like in Valderez. And what the Fifth Circuit said there was the officer had just a matter of seconds to make a quick assessment of the danger presented to the confidential informant in the car in Valderez, as well as the other officers there. And as the court is aware, the Supreme Court has cautioned against second-guessing an officer's assessment, reasonable assessment at the scene, of whether or not there is an imminent threat of bodily harm or death. And the Valderez case is very close to the facts in this case. There, the suspect claimed that as the officers approached the car, the suspect basically got rid of the gun that he had pulled, that the officers had seen him pull, and threw it back into the car. And he said that the officers should have realized, that the officer who fired the gun should have realized that he had gotten rid of the gun and was no longer an imminent threat. And you caution against second-guessing, but is a district court necessarily second-guessing when it just says, hey, there's a factual dispute here? It's not clear what happened. There's a factual dispute. Is that second-guessing? I'm not sure, Your Honor, I'm not sure I would say it's second-guessing as much as speculating as to what Officer Harville saw. And the court's opinion specifically says that the video evidence suggests that the gun could have been seen by the officers. And I think that is clear speculation when there's no video evidence even coming from the same direction from Officer Harville, as well as the closest video evidence that we have is from the dry season video, which is across the street and diagonal from where Jason Roque was. And again, it's even closer than where the officers were. But when you watch that video, it's pretty clear, or in fact, it's not clear at all, that the gun even fell from that video, which is closer, again, from where the officers were. And so it really is, Your Honor, the more I think about it, it is in a way second-guessing Officer Harville's decision. But you don't disagree that whether the officer saw him drop the gun and whether the officer should have known that he was incapacitated after the first shot, you can't dispute that those two questions are not material to the outcome of the case. That's true, Your Honor. With the caveat that the court said in Valdez, that if the officer reasonably believes that the suspect is either reaching for a gun or about to use the gun or is still using a gun, as in this case, then whether or not the suspect is actually still armed is not material. And I think in this case, the Supreme Court has clearly said that one of the purposes of qualified immunity is to basically allow officers to have some reasonable leeway in making these split-second decisions. And I think you can see that here in this case. If Officer Harville or an officer in his situation does not fire the second and third shots and the suspect actually has a real gun instead of a BB gun, and the officer hesitates and waits until he has absolute confirmation that the suspect is still armed, then the suspect could very well use the gun on an innocent third party. And then, of course, the officer would be second-guessed as to, well, why didn't you use force to stop that? You mentioned speculation. The plaintiff's expert said the officers should have seen Jason drop the gun. And how does that amount to speculation? Your Honor, I think because it was, again, all the expert did was review the same video that the district court did as well as go to the scene, obviously at a later date, a completely sterile scene when no one has waved a gun around, when he's not listening to any radio, it's not a hectic scene. The expert knows exactly what has already happened. And I think the expert is doing nothing more than speculating as well in that circumstance. Again, I think it would be different if the eyewitness was close to the same perspective as Officer Harville, or there was some other video evidence that demonstrated from his viewpoint and from that distance that far away, he saw either that the suspect was incapacitated or, in some other way, not in imminent danger or threat to anyone. And that's just not the case here. I think this is exactly like the case in Valderas. And as the court knows, the courts have held, the Supreme Court has held, that an officer is completely justified in continuing to use deadly force as long or until the threat is ended. And there is no evidence other than pure speculation from Officer Harville's perspective that the threat had ended at that time. Counsel, it seems that some of your arguments really go into whether there is a genuine issue of material fact. The genuineness of whether there's a fact issue, not whether it's a material fact issue. And I'm not sure you answered. Assuming, arguendo, that there is, those, the matters that he, Judge Willett, asked you about, those are material to the decision, correct? And the district court found there was a material fact issue. I'm trying to deal with our jurisdiction here. Yes, Your Honor. I agree for the most part that what Judge Willett asked was material, except, as I said, the fact, if Officer Harville reasonably believes that there's still an imminent threat, then whether or not Roque still has the gun is not material, just like the court in Valderas found. Right, but it's whether or not a reasonable officer would reasonably believe, would believe that there was a material threat, given the situation. That's correct, Your Honor, and I agree. But I would like to turn briefly back to whether or not there was, it was clearly established that his conduct was a violation of the Fourth Amendment. And this isn't the same fact pattern, as I said, as Tennessee Garner, Dorsey's Garner, and it's also not the same, close to the same fact pattern as in Mason. There's no evidence that he was clearly incapacitated. As he's shot, and this is shown on the video, he turns away from the officers. You can see on the video that his arms are actually blocked by his torso, and he's still standing. He's not face down on the ground as in Mason. He's able to run a little over 10 yards after the first shot. So he's still moving, and he's in fact still moving in the general direction of his mother. He's moving south along the sidewalk and the road, which is moving closer to Mr. Roque's mother than he was before. So there was no established precedent that clearly established that what Officer Harville did was a Fourth Amendment violation. Thank you. You saved time for rebuttal. Thank you, Ron. Mr. Edwards. Please, the court. I think the court has a good grasp of the issues here. The issues are would a reasonable officer have seen Jason Roque drop the gun after he was shot the first time? And as he was staggering materially away from the supposed person that the officer was trying to protect, did he have the capacity to be a threat? He did not. As an objective, factual matter, what happened here was a despondent, suicidal person engaged in a confrontation, erupted with the police, and Officer Harville chose to fire first. And with their three shots at issue here, following an arguable command to show me your hands, which the young man did, and then a command, arguably, from some other officer to put the gun down. And then instantly after that, Officer Harville shoots Jason Roque in the torso. It doesn't kill him, but it does debilitate him. From that point on, and what's significant about that is that this is not a split-second bang, bang, bang, bang, bang, where officers continue firing until the threat has finished. This is shot number one, the gun drops. And contrary to my actual good friend and opponent, Mr. Laird's, argument, there is a fact issue as to whether or not the gun can be seen dropping. It can be seen on the video in Record on Appeal 1494, 1495, and 1496. Is there any conflicting information in the officer's testimony about what they saw? I mean, do they all agree that they did not see Jason drop the gun, that they thought he was a continuing threat to his mother even after the first shot? Well, it depends which verified statements you're talking about with the officers. At first, Officer Harville said that he thought he was shooting Jason Roque because he was pointing the gun at Albina Roque, Jason's mom, and that he shot her in the back. That proved false. When we looked at the video, it shows him turning. And accordingly, Judge Yackel said, well, that's a close call. He's turning in the general direction of the officers with a gun that, admittedly, Officer Harville did not know was an unworkable BB gun. So we take the position that that's not knowable to the officer. And then from that point forward, he stumbles into the street roughly 10 to 16 yards. But the officers testified from different vantage points than Officer Harville, mind you, that they didn't see a gun drop. But Officer Connolly acknowledged that he should have seen the gun drop. And what's important about that is that an officer doesn't escape liability for excessive force by simply saying, you know, the real situation didn't occur. I mean, here it's arguable that the first shot he fired at Jason Roque was not excessive force. There's a good faith debate. Justice Yackel disagreed with the plaintiffs. But as you are well aware, as the Fifth Circuit has repeatedly held, and I think you and Amador in particular, once the threat ends, you do not get to continue shooting. So you judge excessive force at the moment of the threat. And here, while Judge Yackel's opinion says that two seconds later, shot two was fired, and then approximately two seconds later, if you actually look at the videos, which I believe are record on appeal 1132, 1133, 1134, and 1159, it actually shows three seconds elapsing between shots one and two, and then another three seconds elapsing between shots two and three. And so while oftentimes I suppose attorneys can play word games with what the word split second determination means, but it doesn't mean that someone gets to train a rifle on someone and continue training it on them until they kill them. When the warning, so to speak, was drop the weapon, and exactly one second after that was given, as a matter of factual objective reality, Jason Roque did in fact drop the weapon. And again, Officer Harville says that he couldn't see it. Now, there's a difference between he says he didn't see it and he says he couldn't see it. He makes both statements. Because he said he couldn't see it, we sent an expert to the scene from the exact same vantage point. He not only saw the gun drop from the exact same vantage point, he heard it. That alone creates a factual issue as to whether or not Officer Harville could have seen it. In addition, we hired a visual perception expert, a PhD trained in this. He watched the videotapes. He watched the best videotape that the appellants say, where it's not as crystal clear. It shows a flicker. He explains why that's significant. In addition, it's not just the video. It's not just expert testimony. Mrs. Roque, again, the decedent's mother, saw the gun drop. Now, again, they're welcome to make the case at trial that he reasonably misperceived what actually saw. They can even make the case that he couldn't see it. But they don't win on summary judgment at a qualified immunity standard when there's clearly fact issues on this. And that's what Judge Yackel found. He decided the issue is, is Jason Roque a threat when the firing happened? And by no stretch, whether it's four or five or six seconds after the first shot, you have a seriously wounded individual who is, if you really do credit all of the inferences in plaintiff's favor, has been compliant and has followed the commands of the police, is moving away from the only thing that could possibly pose a threat, albeit in reality, didn't pose any threat at all. But again, we're not here suggesting that because it's an unworkable BB gun, that plaintiff should prevail. It looked like a gun. We understand that it's only facts knowable to the officers that are in play for qualified immunity. But the fact is, it was knowable to Officer Harville that the gun had dropped. His fellow officer, Officer Connolly, said he was asked this question. Did you see a drop? Could you see? I could. Could I? Sure. And then the follow up. Not could have, sir. Should you have seen a drop? And he said, sure, I should have. Or words to that effect. I mean, this is this is, again, taking Mr. That's that's the is there a violation of the Fourth Amendment and excessive force? But is it clearly established? Again, this is a more obvious case than Tennessee v. Garner because we have Tennessee v. Garner. The only difference between Tennessee v. Garner in this particular case is that from the start, the individual in Garner was unarmed. Here he's armed until shot number one. But from that point forward, he's he's every bit the same person. Again, this isn't a seasoned criminal that the police were dealing. This is a suburban Austin neighborhood where a mom called for help. And admittedly, the police were confronted with a difficult situation. But just because it's a difficult situation doesn't mean that there's a license to if an officer believes he's permitted to begin firing, that he gets to continue firing even when a reasonable officer would know that the threat is no longer present. Mr. Edwards, you've mentioned several times that there was hardly any time between the initial command and the first shot. But we are not at all dealing with the first shot right now. Correct? No, no, no, we're not. The only reason that I mentioned that is to the extent the court has any concerns about, you know, we're warnings given again. You know, technically a warning was given before the first shot. Our position would be that it's meaningless because of how quickly Officer Harville fired. But that's not why we're here. Officer Harville did turn. And the irony of this is that the Officer Harville and his counsel want the video to be dispositive when it benefits them. When he turns, even though that's not what Harville perceived. It's not what anyone else perceived. But in reality, it shows what happened. But when he's dropping the weapon and objectively, he's just not a threat at all. They say, well, we have to believe what Officer Harville says. Well, that's not the way the law works. And again, that's what that's what a jury is for to decide whether or not he did see it. He could see it. But obviously, as Judge Willett and yourself have articulated, these are material issues. And as such, you know, it would be in this court doesn't have jurisdiction at this point to really make this call. And just to be arguing the same points, if either you hadn't hired all these experts and all we had was the video. Well, if all we if all we had was the video, that would be enough, frankly. OK, I mean, it's because we went above and beyond and got additional evidence doesn't make it any less so. The video, I think what's key about the video is that the video obviously shows that he's no longer a threat as an objective matter. And then from the video and the vantage points, you can see not only the gun dropping, but you can also see the gun on the sidewalk. And so there were multiple opportunities over this five to six seconds. And again, I believe it's the Amador case where it highlighted, you know, in Lytle, the court court said three seconds later or maybe three to 10 seconds later, the situation changes. Therefore, the ability to use excessive force changes in Amador. I think it was five seconds. The situation changes. Therefore, the ability to use excessive force changes. That's the point of Mesa. Well, I may not personally agree with the first five shot analysis. The point of the matter is for shot six and seven, the situation changed. The threat was gone or at least there was a fact issue. And so a jury gets to decide that. Again, I don't want to belabor this. I think that this is fairly straightforward, but I'm happy to answer any other questions that the court has. Do any of the judges have questions? No. OK, then I'll I'll just conclude by by reiterating that. Though it's not the key, this this isn't this isn't any one situation. This is a suicidal, despondent person. And I just want to reiterate just because a job is difficult doesn't mean that it shouldn't be done appropriately. And in accordance with the law to suggest, albeit through appellate counsel, that the fact that Jason Roque dropped the gun after being told to and after being shot is irrelevant. Is directly contrary to well established this circuit law. Thank you very much. Thank you. We have your argument. Mr. Laird, you save time for rebuttal. The. All of the other officers were consistent with Officer Horrible in their testimony. Every single one of them said that none of them saw the gunfall. All of them saw or testified that they still believed that Mr. Roque was an imminent threat of bodily harm to his mother. So they were all consistent. And that is the only evidence that is anywhere close to Officer Horrible's perspective. None of the videos are, but the other officers testimony is. What about the experts who went and reenacted this? Yes, your honor. I mean, that they they did do that from the same direction in the same distance. But again, that's not it's not under the anywhere close to the same conditions. It's a cold, sterile environment where they know what happened and they're not. It's not anywhere close to what and basically what they all the experts are doing is speculating. It's not where close to what Officer Horrible was dealing with, which was a very tense, fast situation. And he had a matter of seconds to make an assessment and decide what to do. Is that a jury argument? Pardon? Is that a jury argument? No, your honor. It's not because there has to be clearly established law that what he was doing was a violation in the court. The Supreme Court in Casella, as well as well as the Fifth Circuit in Valdez, says that, you know, the officer has mere seconds to assess the danger. And in those cases, they are entitled to qualified immunity unless there is existing precedent which squarely governs the facts in this case. And as I said earlier, the precedent relied on by the district court, Tennessee versus Garner and the Mason case are completely distinguishable from this case. So unless the court has further questions, request that the court reverse the district court's denial of summary judgment. Thank you, Mr. Laird. We appreciate both of you appearing today by Zoom so we could hear from you. And this case is submitted.